

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## No. 02-21-00376-CV

_____

IN THE INTEREST OF A.O., III, C.O., A.O., N.O., A.O.,
L.W., AND T.J., CHILDREN[1]

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-680333-20

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

---

[1]Appellant's oldest child, L.O., was included in the Department's original petition to terminate the parent–child relationship, but L.O. turned eighteen while the trial court case was pending, and the trial court's judgment confirms that L.O. is "no longer a subject of this suit."  *See* Tex. Fam. Code Ann. §§ 101.003(a) (defining "[c]hild"), 101.025 (defining "[p]arent–child relationship").  Accordingly, L.O. is not a party to this appeal and has been removed from the style of the case.

# MEMORANDUM OPINION

Appellant J.W. (Mother) appeals the termination of her parental rights to seven of her children: A.O.III (Aaron), C.O. (Chelsea), A.A.O. (Amanda), N.O. (Nancy), A.V.O. (Audrey), L.W. (Lauren), and T.J. (Tyler) (collectively, the Children).[2] Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings (1) that she violated three statutory predicate grounds for termination under Texas Family Code Section 161.001—including the two endangerment predicate grounds; and (2) that termination was in the best interest of the Children. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (b)(1)(E), (b)(2). She lodges only a cursory challenge to the endangerment predicate findings, but her best interest challenge highlights notable evidence in her favor, including the evidence that she completed everything asked of her in the court-ordered service plan prepared by the Department of Family and Protective Services.

Indeed, the record contains evidence both for and against the trial court's best interest finding. We do not envy the trial court's role as factfinder in this case. But for much the same reason, because the best interest evidence was not so lopsided as to require a finding in either direction, the factfinder could have reasonably formed a firm belief or conviction that termination was in the best interest of the Children.

[2]The children are listed by order of birth. When the trial court terminated Mother's parental rights in November 2021, the Children were sixteen (Aaron), fourteen (Chelsea), thirteen (Amanda), eleven (Nancy), eight (Audrey), six (Lauren), and three (Tyler).

And because it could have similarly concluded that Mother's pre-removal actions violated the two endangerment predicate grounds, we will affirm the trial court's order of termination. *See id.*

## I. Background

At the time of the termination trial, in September 2021, Mother had eight Children—one adult daughter plus the seven Children who are the subject of this case. Mother had her six oldest children (her adult daughter plus Aaron, Chelsea, Amanda, Nancy, and Audrey) with Father One,[3] she had her seventh child (Lauren) with Father Two, and she had her eighth child (Tyler) with Father Three. Although these fathers were largely absent from the Children's lives, one of them—Father Two—played a central role in Mother's questionable pre-removal conduct.

### A. Pre-Removal Conduct

The events that led to the 2021 termination trial began more than six years earlier in 2015.

---

[3]In 2009, Father One sexually assaulted a daughter that he had conceived with a woman other than Mother. Father One was convicted of two counts of aggravated sexual assault and two counts of indecency with a child, and in 2013, he was sentenced to 35 years' confinement. Mother had six children with Father One between 2002 and 2013; she testified that Father One had not been involved in the Children's lives and had rarely been alone with them. She stated that she had not known about the sexual assault accusations prior to Father One being indicted and that none of her Children had ever made outcries that Father One had abused them.

3

### 1. Sexual Assault of a Minor, Father Two

When Mother's seventh child, Lauren, was born in October 2015, Lauren's father, Father Two, was 15 years old and Mother was 31 years old. In other words, Lauren's birth showed that Mother had had sex with a minor. *See* Tex. Penal Code Ann. § 22.011(a)(2).

To make matters worse, Father Two was Father One's nephew, and Mother already had six children with Father One when Lauren was born.[4] But Mother and Father Two testified at trial that when they slept together, they had not been aware of one another's relationship with Father One. They both claimed that they had met by happenstance at a local store and that Mother had thought Father Two was 18 years old when they had sex. A reasonable factfinder could have questioned this testimony, though.

For one thing, Father Two testified that he and Mother first met in June 2015, even though their baby was born in October 2015. Father Two corrected his error only after the Department's counsel pointed out that pregnancies generally last nine months; at that point, Father Two stated that he had "mixed up [his] words."

Furthermore, Father Two testified that he told Mother he was 18 for multiple years. From the time they met when Father Two was, at most, 15 years old[5] until

---

[4]Mother's now-adult daughter, L.O., is approximately two years younger than Father Two.

[5]*See infra* note 8.

4

Father Two turned 17 years old, he claimed that he continued to tell Mother he was 18.

Whatever the case may be, even if Mother had believed that Father Two remained 18 over a multi-year period, knowledge of a child's age is not an element of sexual assault of a minor. *See id.* "[A] child cannot consent to sexual contact or intercourse" with an adult. *Smallwood v. State*, 471 S.W.3d 601, 607 (Tex. App.—Fort Worth 2015, pet. ref'd) (op. on reh'g). Mother was thus indicted for second-degree felony sexual assault of a child under 17 years of age. *See* Tex. Penal Code Ann. § 22.011(a)(2).

## 2. Gun Incident with Father Three

Approximately three years after Mother had Father Two's child, she had a child with Father Three. Mother testified at trial that, unlike Father Two, Father Three had not been a minor when they first had sex; he had been "about 18 or 19."

Regardless, Mother was involved in a different criminal incident with Father Three. She testified that she had been arguing in a vehicle with Father Three[6] and that, for unexplained reasons, he was holding a loaded gun in his lap. Mother claimed that she thought Father Three was reaching for the gun, so she reached for it as well,

---

[6]Father Three was subsequently convicted of multiple felonies, including engaging in organized criminal activity and aggravated robbery with a deadly weapon, and he was sentenced to 27 years' confinement. Father Three was already incarcerated when the Children were removed from Mother's care in April 2020. Mother testified that she did not know if Father Three was involved in a gang, and she confirmed that she was not involved in a gang.

5

and as they wrestled, the gun went off. Although neither party was shot, both were "grazed by the clip of the gun" and both were left bleeding.

It is unclear when this incident occurred[7] and what criminal charges were filed as a result of it. However, at trial, Mother alluded to a corresponding criminal case against her, and she testified that Father Three was identified as the "victim" in her case.

### 3. Deferred Adjudication Community Supervision

In 2019, Mother was placed on deferred adjudication community supervision for her sexual assault of Father Two.[8] Due to the gun incident with Father Three, Mother's community supervision included a condition prohibiting her from contacting him. Other conditions of Mother's community supervision included:

Commit no offense against the laws of this State or of any other State or of the United States[;]

. . . .

Do not possess, own, or attempt to purchase a firearm or weapon[;]

---

[7]Mother's criminal incident with Father Three occurred before she was placed on deferred adjudication for sexual assault in March 2019, but it is unclear precisely when it took place.

[8]The documentation supporting Mother's deferred adjudication showed that her offense occurred in early 2014, more than a year before Lauren was born. Because Father Two testified that he was 15 when Lauren was born, the 2014 offense date would have made Father Two either 13 or 14 at the time he had sex with Mother. However, at the termination trial, Father Two testified that he was 15 when they met and had sex.

. . . .

Comply with sex offender registration procedures as required by the laws of this State and of any other State and pay any costs thereof as required by law[; and]

. . . .

Have no contact with any child under 17 years of age [other than Mother's birth children] unless a chaperone approved by the Court or supervision officer is present.

As explained below, the evidence at trial supported a conclusion that Mother violated these conditions.

### 4. Hotel Incident with Children

Several violations occurred in a hotel incident in April 2020, just over one year after Mother was placed on community supervision. There, Mother was in a one-bedroom hotel room with her Children when the Children gained access to a loaded gun and gave the gun to Mother's then one-year-old son, Tyler, who began playing with it and accidentally shot himself.

Mother testified at trial that she had been asleep in the hotel room when the shooting occurred. She explained that the Children[9] welcomed other youths into the room and gained access to a gun that she did not know was present. The Children,

---

[9]Mother testified that, when she went to sleep, the oldest child in the room was 14.

though, told the Department that Mother was not asleep but was instead on the phone.

A Department investigator testified to that effect at trial. She stated that Lauren, who was four years old at the time of the incident, told her that Mother was on the phone when Tyler was shot. The investigator further testified that Mother's nephew—who was one of the youths her Children let into the hotel room—had told the investigator that Mother was on her phone and "that [Aaron's] friend gave [Tyler] the gun and [the friend] was waiting to use [Mother's] phone."

Either way, Tyler was transported to the hospital where he stayed for approximately three nights. He survived but had four wounds, including an injury to his groin area.

This hotel incident was the catalyst that led the Department to file the instant case.

## B. Emergency Removal and Other Ramifications

While Mother was at the hospital tending to Tyler's wounds, the Department took Mother's other Children to the Department's office, and they began making arrangements to seek an emergency removal of the Children.[10]

---

[10]At the time of removal, Mother's oldest child, L.O., was 17 years old and was removed from Mother's home along with her seven siblings.

### 1. Emergency Removal

Just days after the hotel incident, the Department obtained an ex parte order for an emergency removal of the Children. Soon thereafter, it petitioned to extend the removal and terminate Mother's parental rights.

### 2. Motion to Adjudicate, New Charges, and Bond Violations

The hotel incident not only raised concerns regarding Mother's parenting, but it also violated the terms of Mother's community supervision. Based in part on these violations, the State petitioned to proceed to adjudication on Mother's sexual assault of a minor offense. The State alleged that Mother had violated the terms of her community supervision on the day of the hotel incident by possessing a firearm and coming into contact with a minor without an approved chaperone. Additionally, the State alleged that Mother committed other violations, including, among other things, failing to register as a sex offender. Consequently, Mother was separately indicted for failing to register as a sex offender. *See* Tex. Code Crim. Proc. Ann. art. 62.102.

A warrant was issued for Mother's arrest, and she was released on bond but ordered to comply with specific bond conditions, including a condition that she attend sex offender treatment. But because Mother failed to attend all of the required treatment sessions, not long after she had been released on bond, the bond was held insufficient.

9

### 3. Temporary Orders and Service Plan

Meanwhile, the trial court entered temporary orders extending the Children's removal. The temporary orders included a Department service plan that established the conditions for the Children's return.[11] The service plan required Mother to, among other things, "maintain contact with [her case]worker on [a] bi-weekly basis," "participate in a psychological evaluation" and "follow all recommendations on the psychological evaluation," "attend a parenting class," "participate in the [10-week] FOCUS For Mothers Program," "actively participate in and successfully complete individual counseling," "attend all scheduled visitations with her [C]hildren," "provide a safe, stable, and secure home for her children," and "demonstrate the ability to financially support her children."

## C. Post-Removal Conduct

To her credit, over the 17 months that followed—between the time the trial court entered its temporary orders and the time of trial—Mother completed all of the requirements in her service plan.[12] The only exception was individual counseling, which was ongoing at the time of trial and thus not "completed." Despite this

---

[11]The Department worked with Our Community Our Kids (OCOK) to develop the service plan, and an OCOK employee served as Mother's caseworker. Because OCOK and Mother's assigned caseworker effectively served as the Department's agents, we refer to them as Department representatives.

[12]Although Mother's caseworker confirmed that Mother had completed all of the requirements in her service plan, the caseworker referenced several events that would otherwise appear to have violated the service plan.

technicality, Mother's caseworker confirmed at trial that Mother had "completed everything that [the Department had] asked her to complete" and that she regularly visited her Children.[13]

Nonetheless, at trial the Department presented evidence that Mother made notably imprudent choices while the case was pending. Specifically, the Department contended that in 2021 Mother had an unauthorized visit with her son, Aaron, during which visit she and her son posed for a gun-related photograph. In the photograph, Aaron is sitting in front of Mother or on her lap while she points a gun at the camera.

Mother's response was two-fold. First, she testified at trial that her meeting with Aaron had not been an unauthorized visit but that she had run into Aaron while he was filming a music video at a local business. Second, she disavowed any involvement in the taking of the photograph, stating that she did not remember the gun-related photograph being taken, she did not know who took it, and she did not pose for it. But the photo appears to be a selfie, and both Mother and Aaron are looking directly at the camera.

When confronted with the photograph at trial, Mother claimed that she had never seen it before. But she insisted that the weapon in the photo was a plastic "play gun," one that her son had been using in his music video, and that she "could tell by the weight of it and how it looked that it wasn't real." While she admitted that she

---

[13]When Aaron was sent to juvenile detention, Mother visited him and attended his juvenile hearings.

had been playing with the gun, she claimed that she had not intentionally participated in the photograph.

The caseworker's testimony cast doubt on Mother's veracity regarding the events. Contrary to Mother's claim that she had never seen the photo before, the caseworker testified that she had confronted Mother about the photograph several months before trial. Further, the caseworker testified that at the time she confronted Mother about the photo, Mother told her that the gun in the photo "was not a real gun, but a BB gun."

Whether the gun was real or fake, a reasonable factfinder could have found the photograph troubling. The photo was taken after Tyler had shot himself by mishandling a weapon while in Mother's care. The termination case was still pending at the time, and Mother was still subject to the gun-prohibiting conditions of deferred adjudication. Plus, not long after the photograph was taken, Aaron himself was "shot on the streets."[14] By the time trial began in September 2021, Aaron was in juvenile detention, facing up to eight years' incarceration for aggravated robbery.

## D. Trial

At trial, Mother testified to the post-removal efforts and improvements she had made for her Children. For one, she secured stable employment to provide for her

---

[14]Aaron had been adjudicated for instances of delinquent conduct prior to the taking of the gun-related photograph. The specific instances and dates of Aaron's delinquent conduct were documented in the caseworker status reports contained in the court's file, but no delinquent conduct testimony was offered at trial.

Children. Mother testified that she had two jobs; one established job at a fast-food establishment where she earned approximately $500 per week, and another job at a warehouse that she was scheduled to start with similar pay expected. Between the two jobs, Mother anticipated working 14 hours per day: 3:00 p.m. to 10:00 p.m. at the warehouse, and 10:00 p.m. to 5:00 a.m. at the fast-food establishment.[15]

And Mother had made arrangements for child care while she worked. According to Mother, either her mother (Grandmother) or her adult daughter would help watch the Children while she was at work. It was not clear from her testimony, however, whether either adult could stay with the Children overnight when Mother worked a nightshift.

Additionally, Mother had secured housing for the Children. At the time of trial, Mother was renting a two-bedroom home[16] that contained two sets of bunk beds—each with a full bed on bottom and a twin on top—plus a toddler bed for Tyler.

She also testified that she had "changed [her] ways of parenting" to address the Department's concerns. Mother described how she had undergone counseling, taken a parenting class, taken a gun safety class, and "learned to be a mom instead of a

---

[15]However, Mother testified that she was not sure whether she would keep the warehouse job; she confirmed that she was just "testing it out" for more income.

[16]Mother paid approximately $825 each month in rent.

13

friend" and to "enforce rules with my children instead of . . . feeling sorry that their dads are not in the picture."

While Mother's caseworker confirmed that Mother had "completed everything that [the Department had] asked her to complete," the caseworker disagreed that Mother had changed her parenting style. She emphasized that the service plan was "not a checkoff list" and stated that despite its completion, she had concerns about Mother's "decision-making" skills and her "inability to protect her children." The caseworker testified that Mother "continue[d] to make [poor] decisions" and had not "taken full responsibility of what's happened with her children," nor had she "talk[ed] to her children about [their] behaviors." She "believe[d] [that Mother] love[d] her children," but she did not "think [Mother] always act[ed] in the best interest of her children." And when asked about Mother's stability, the caseworker indicated her concern that Mother might go to prison for her pending charges and, if she did, would not be available to parent.[17]

The Department proposed splitting the six youngest Children up among three of Mother's relatives—Mother's aunt and two half-sisters. Two of the three proposed placements were awaiting home studies,[18] though, and none of the placements had

---

[17]Mother's criminal defense attorney testified that there was not a pending court date for the resolution of either of her cases—her revocation of community supervision case or her failure to register as a sex offender case.

[18]The caseworker testified that she did not anticipate any problems arising from the home studies.

been licensed to adopt the Children. Plus, the three proposed placements only covered the six youngest Children. Because Aaron was in juvenile detention, the caseworker indicated that the Department had no placement options for him. Nonetheless, the caseworker opined that termination was in the best interest of the Children because "[t]he [C]hildren deserve[d] to have permanency," and the three proposed placements had indicated that they "w[ould] take on the responsibility . . . but only if they d[id]n't have to deal with [Mother]."

## E. Termination Order

After considering the evidence, the trial court entered an order finding that Mother had

[1] knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to § 161.001(b)(1)(D), Texas Family Code;

[2] engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 161.001(b)(1)(E), Texas Family Code; [and]

[3] been convicted or ha[d] been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the . . . serious injury of a child under the following sections of the Penal Code . . . :

§ 21.11 (indecency with a child); [and]
§ 22.011 (sexual assault)

pursuant to § 161.001(b)(1)(L), Texas Family Code[.]

15

[Indentation altered.] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (b)(1)(E), (b)(1)(L), (b)(2). Based on these findings, together with a finding that termination was in the Children's best interest, the trial court terminated Mother's parental rights to all seven Children.[19]

## II. Sufficiency Challenges

Mother challenges the legal and factual sufficiency of the trial court's findings.

## A. Standard of Review

To terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy at least one statutory predicate ground listed in Family Code Section 161.001(b)(1) and (2) that termination is in the child's best interest. *Id.* §§ 161.001(b)(1), (2), 161.206(a), (a–1); *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Clear and convincing evidence of just one statutory predicate ground, together with a best interest finding, will support a termination order. *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022); *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *J.F.-G.*, 627 S.W.3d at 311 n.14.

---

[19]The trial court's order also terminated Father One's rights to Aaron, Chelsea, Amanda, Nancy, and Audrey, and it terminated Father Three's rights to Tyler. Neither father has appealed.

The heightened clear and convincing evidentiary standard at trial requires a similarly heightened standard of review on appeal. When reviewing the sufficiency of clear and convincing termination findings, we ask whether a reasonable factfinder could have formed a firm belief or conviction that the challenged finding was true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Both legal and factual sufficiency turn on this question; the distinction between the two sufficiency analyses "lies in the extent to which disputed evidence contrary to a finding may be considered" in answering the question. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In our legal sufficiency analysis, we "look at all the evidence in the light most favorable to the finding," assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so and disregarding all evidence that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545; *see A.C.*, 560 S.W.3d at 630–31. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review.").

Although the two analyses differ in scope, neither allows us to supplant the factfinder's judgment with our own. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder remains the sole arbiter of the credibility and demeanor of witnesses. *Id.* at 109; *In re G.F.*, No. 02-21-00267-CV, 2022 WL 524138, at *4 (Tex. App.—Fort Worth Feb. 22, 2022, pet. den.) (mem. op.); *In re E.F.*, No. 02-21-00075-CV, 2021 WL 4101627, at *2 (Tex. App.—Fort Worth Sept. 9, 2021, no pet.) (mem. op.); *see A.C.*, 560 S.W.3d at 630 (noting that both legal and factual sufficiency review must "honor . . . the deference an appellate court must have for the factfinder's role").

Plainly, the legal and factual sufficiency determinations contain many overlapping elements. If the evidence is factually sufficient, it is necessarily legally sufficient. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.); *In re M.V.G.*, 440 S.W.3d 54, 60–61, 63 (Tex. App.—Waco 2010, no pet.). Therefore, and because Mother challenges both legal and factual sufficiency, we will conduct a consolidated review.

## B. Statutory Predicate Grounds

The trial court found that Mother violated three statutory predicate grounds under Family Code Section 161.001(b)(1): (1) subjecting the Children to endangering "conditions or surroundings" under Subsection (D); (2) engaging in conduct that endangered the Children under Subsection (E); and (3) being placed on community supervision for the serious injury of a child in violation of two Penal Code provisions

under Subsection (L).  Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (L).  Mother

challenges the sufficiency of all three predicate findings. [20]

### 1. Subsections (D) and (E): Endangerment

Mother first lodges a cursory challenge to the two endangerment findings—the

findings under Subsections (D) and (E).  *Id.* § 161.001(b)(1)(D), (E).  Because these

two findings are interrelated, we review them together.  *See In re J.B.*, No. 02-21-

00239-CV, 2021 WL 6144074, at *21 (Tex. App.—Fort Worth Dec. 30, 2021, no pet.

h.) (mem. op.) (recognizing that evidence of environment-based and conduct-based

endangerment is often interrelated); *In re U.L.*, No. 02-21-00218-CV, 2021 WL

5227087, at *5 (Tex. App.—Fort Worth Nov. 10, 2021, pet. denied) (mem. op.)

(similar); *In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort

Worth Oct. 12, 2017, no pet.) (mem. op.) (similar); *In re J.T.G.*, 121 S.W.3d 117, 126

(Tex. App.—Fort Worth 2003, no pet.) (similar).

### a. Applicable Law

Subsections (D) and (E) both require a finding that the parent endangered the

child's physical or emotional well-being.  Tex. Fam. Code Ann. § 161.001(b)(1)(D),

---

[20]"If the trial court terminates on multiple grounds, if grounds under Sections 161.001(b)(1)(D) or (E) are among those grounds, and if the parent challenges the findings on the (D) and (E) grounds, the appellate court must address either the (D) or (E) grounds on appeal (or both if neither withstands appellate review) because they may have collateral consequences if the parent has other children." *In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *3 n.5 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.); *In re J.B.*, No. 02-21-00239-CV, 2021 WL 6144074, at *20 (Tex. App.—Fort Worth Dec. 30, 2021, no pet. h.) (mem. op.) (similar).

(E).  To "'[e]ndanger' means to expose to loss or injury; to jeopardize."  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *J.B.*, 2021 WL 6144074, at *21; *U.L.*, 2021 WL 5227087, at *4.  The relevant source of the child's "expos[ure] to loss or injury" differs between Subsections (D) and (E), though.  *U.L.*, 2021 WL 5227087, at *4; *see In re J.L.B.*, No. 07-21-00143-CV, 2021 WL 5919468, at *5 (Tex. App.—Amarillo Dec. 15, 2021, no pet.) (mem. op.).

Endangerment under Subsection (D) focuses on the child's environment as the source of endangerment.  *E.F.*, 2021 WL 4101627, at *1.  "A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."  *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *see In re A.M*, No. 02-19-00023-CV, 2019 WL 3334420, at *8 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op.) (noting that "[a] parent need not know for certain that the child is in an endangering environment[;] awareness of such a potential is sufficient").  Given the nature of environment-based endangerment, it logically follows that the relevant timeframe for such endangerment is prior to the child's removal.  *In re S.K.G.*, No. 13-21-00145-CV, 2021 WL 4897865, at *4 (Tex. App.—Corpus Christi–Edinburg Oct. 21, 2021, no pet.) (mem. op.); *In re C.R.*, Nos. 07-20-00314-CV, 07-20-00314-CV, 2021 WL 711498, at *2 (Tex. App.—Amarillo Feb. 23, 2021, pet. denied) (mem. op.); *A.M*, 2019 WL 3334420, at *8; *see In re M.L.*, No. 07-21-00160-CV, 2021 WL 5824205, at *3 (Tex. App.—Amarillo Dec. 8, 2021, no pet.) (mem. op.).  But although Subsection (D) focuses on the child's environment,

the conduct of the parent or another person in the home is still relevant. *See J.B.*, 2021 WL 6144074, at \*21–22. Such conduct can create an endangering environment, and if it does, a single pre-removal act, omission, or incident can support termination. *Id.*; *E.F.*, 2021 WL 4101627, at \*1.

Endangerment under Subsection (E), in contrast, focuses on the parent's conduct as the source of endangerment and requires a "voluntary, deliberate, and conscious course of conduct" rather than "a single act or omission." *J.B.*, 2021 WL 6144074, at \*21; *In re B.K.*, No. 02-21-00175-CV, 2021 WL 5848769, at \*4–5 (Tex. App.—Fort Worth Dec. 9, 2021, pet. denied) (mem. op.) (quoting *In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at \*2–3 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (per curiam) (mem. op.)); *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at \*13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct, evidence of endangerment under Subsection (E) "is not limited to actions directed towards the child," *J.F.-G.*, 627 S.W.3d at 315 n.43 (quoting *J.O.A.*, 283 S.W.3d at 345), nor is it limited to the parent's pre-removal actions. *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at \*2 (Tex. App.—Fort Worth Feb. 18, 2022, no pet. h.) (mem. op.) (recognizing that Subsection (E) analysis "may consider actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody"); *In re M.W.*, No. 02-21-00146-CV, 2021 WL 3679247, at \*4 (Tex. App.—Fort Worth Aug. 19, 2021, pet. denied) (mem. op.) (recognizing that "[a] parent's past endangering conduct can create an

21

inference that similar conduct could recur and further jeopardize a child's well-being"); *see also In re S.A.G.*, No. 07-15-00035-CV, 2015 WL 3750289, at *3 (Tex. App.—Amarillo June 11, 2015, no pet.) (mem. op.) (noting that "[S]ection 161.001(1)(E) does not require a showing that [the parent] knew her conduct was endangering to her children").

Because we are reviewing the two endangerment findings together, though, and because the relevant time period for an environment-based endangerment finding under Subsection (D) is prior to removal, we limit our joint Subsection (D) and (E) endangerment analysis to Mother's pre-removal conduct and the Children's corresponding pre-removal environment.

### b. Analysis

The trial court's Subsection (D) and (E) endangerment findings are supported by two primary categories of pre-removal evidence: (1) the evidence surrounding the hotel incident in which Tyler shot himself in Mother's presence, and (2) the evidence of Mother's criminal history and its accompanying ramifications.

### i. Hotel Incident

The hotel incident was strong evidence of both environment-based endangerment and conduct-based endangerment.

In that incident, Mother left her Children dangerously unsupervised. The evidence showed that even though Mother was in the room with the Children, she was so utterly preoccupied and distracted by her phone that she did not notice when

22

her Children allowed other youths to enter their hotel room. The youths' mere presence violated the terms of Mother's community supervision, but, more importantly, Mother's preoccupation and distraction led to disastrous consequences when she failed to notice that one of the youths had given her one-year-old a loaded gun to play with.

"Endangerment can be exhibited by both actions and failures to act," and here there can be no doubt that Mother's failure to act—specifically, failure to adequately supervise—endangered her Children. *A.M*, 2019 WL 3334420, at *8 (discussing sufficiency of Subsection (D) finding). Had Mother been paying any attention at all, she would have noticed when her Children opened the door to the outside and allowed visitors to enter. And had she noticed that, she could have prevented the youths from entering the room and thus violating the conditions of her community supervision. And had she turned the visitors away to avoid violating the terms of her community supervision, the loaded gun would never have entered the hotel room and found its way into the hands of her infant son.

Furthermore, the nature of the incident supports a reasonable inference that Mother's distraction was not one of fleeting duration. Although she was in the same room with her Children, Mother's distraction continued long enough for not only the armed youth to enter the room without Mother's notice, but also for the handgun to make its way into the hands of one-year-old Tyler, and then beyond. Once the gun found its way into Tyler's hands, Mother was still distracted, and she remained so for

long enough for Tyler to manage to apply enough force to the handgun to pull the trigger and discharge the weapon—no easy task for an infant. This was not a momentary distraction. It was a distraction of some duration.

Nor was it a distraction caused by an emergency or by the performance of necessary or important duties or obligations. At the time the events transpired, Mother was not using the restroom, cooking dinner, or taking care of another child; she was on her phone.[21]

Mother does not identify any evidence to contradict the endangering nature of her actions, much less "significant" evidence that the factfinder could not have credited in favor of the finding. *A.C.*, 560 S.W.3d at 631. In her one-page endangerment analysis she summarizes the hotel incident in three sentences with no explanation as to why the Children were allegedly not endangered by Mother's conduct in the hotel room or by the unsupervised environment she permitted.[22]

---

[21]Although Mother claimed that she had been sleeping when the incident occurred, the caseworker identified two of the children who reported that she was on the phone. The trial court was entitled to believe the caseworker's testimony over Mother's. *See H.R.M.*, 209 S.W.3d at 108–09; *E.F.*, 2021 WL 4101627, at *6 (discussing sufficiency of Subsection (D) and (E) findings and noting "the trial court did not have to take [the father's contradicted testimony] as true, nor did the trial court have to consider [f]ather credible"). Even if Mother had been sleeping instead of focusing on her phone, this only identifies a different cause for her failure to properly supervise her Children. It does not excuse her behavior.

[22]The three relevant sentences in Mother's brief state: "Prior [to] the DFPS intervention in this case, the youngest child was shot. One of the children's friends brought a firearm to [Mother's] hotel room. [Mother] was asleep or was on the phone."

24

At best, Mother's cursory discussion of the hotel incident could be understood as challenging whether she endangered her child knowingly, referencing the fact that she did not give Tyler the gun and that the shooting was an accident. *See In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019) (instructing courts of appeals to "broadly construe issues to reach all core and substantive questions . . . when reasonably possible").

But the knowing nature of Mother's conduct is only relevant to the court's environment-based endangerment finding under Subsection (D); "[s]cienter is not required for an appellant's own acts [to constitute endangerment] under Section 161.001(b)(1)(E)." *In re I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied) (op. on reh'g); *see In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g) (noting that "scienter is only required under [S]ubsection (E) when a parent places the child *with others* who engage in an endangering course of conduct").

More to the point, Mother cannot use her preoccupation with her phone as an excuse to disclaim responsibility for the threat she was too preoccupied to observe. Mother was aware that leaving her Children—including her one-year-old infant—unsupervised in a hotel room created a potentially dangerous situation that jeopardized their safety. "A parent need not know for certain that the child is in an endangering environment" or "have certain knowledge that an actual injury is occurring" to endanger the child under Subsection (D); "awareness of such a potential

25

is sufficient." *A.M*, 2019 WL 3334420, at \*8; *In re R.L.*, No. 2-08-064-CV, 2008 WL 2930564, at \*3 (Tex. App.—Fort Worth July 31, 2008, no pet.) (per curiam) (mem. op.); *see, e.g.*, *In re Tidwell*, 35 S.W.3d 115, 119–20 (Tex. App.—Texarkana 2000, no pet.) (affirming Subsection (D) finding where mother was aware of credible allegations of sexual abuse but did not have actual knowledge that the abuse had occurred). Mother was not required to have seen Tyler playing with the loaded gun—much less to have handed Tyler the gun herself—to have knowingly exposed her Children to the unsupervised environment that resulted in the shooting.

Thus, whether we view the evidence in the light most favorable to the judgment or weigh all of the disputed evidence, *see A.C.*, 560 S.W.3d at 630–31, the record supports the conclusion that Mother's distraction and failure to supervise her Children created a dangerous condition in which Mother's then-one-year-old infant could gain access to, play with, and shoot himself with a loaded gun, all in Mother's presence but without her notice. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

### ii  Criminal Behavior

Mother's pattern of criminal behavior was also evidence of her endangering course of conduct and of the endangering environment this conduct created.

"[A] pattern of criminal behavior . . . with its attendant effects on the lives of children, may constitute endangering conduct under [S]ection 161.001[(b)](1)(E)." *S.A.G.*, 2015 WL 3750289, at \*4 (affirming Subsection (E) finding based on mother's "commi[ssion of] a new offense and violat[ion] of the terms of her community

supervision"). And those attendant effects can include an unlawful and unstable home environment; "unlawful conduct by persons who live in the child's home . . . is a part of the 'conditions or surroundings' of the child's home under [S]ection 161.001[(b)](1)(D)." *M.R.J.M.*, 280 S.W.3d at 502.

Here, Mother repeatedly violated the provisions of the Penal Code, of her community supervision, and, after the Children were removed, of her bond.[23] She committed a second-degree felony by having sex with a minor, and when she received deferred adjudication for that offense, she violated the terms of her community supervision and failed to register as a sex offender, again subjecting herself to potential incarceration and paving the way for new felony charges. On top of that, Mother violated the terms of her bond. These actions were indicative of a pattern of lawbreaking that created a looming threat of incarceration—both in the short term (due to her bond violations) and in the long term (due to her pending felonies). *See In re Y.F.J.*, No. 02-12-00111-CV, 2012 WL 5949479, at *3 (Tex. App.—Fort Worth Nov. 29, 2012, no pet.) (per curiam) (mem. op.) (holding no arguable grounds for appeal of Subsection (E) finding where the father "repeatedly committed criminal acts that subjected him to the possibility of incarceration"). And since Mother was the Children's primary caregiver, the looming threat of her incarceration subjected the

[23]The community supervision violations listed in the State's motion to adjudicate occurred on or before the date of the Children's emergency removal. The bond violations, however, occurred after removal, and we do not consider them as part of the Subsection (D) analysis.

Children to ongoing instability. *See id.* (noting that "[e]ach time [the f]ather was jailed, he was absent from his children's lives and unable to provide a home or support"). Because "[s]tability and permanence are paramount in the upbringing of children," *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied), "a parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's well-being," *M.W.*, 2021 WL 3679247, at *4. *See also C.Y.*, 2022 WL 500028, at *3 (quoting *M.E.-M.N.* and *M.W.*).

As with the hotel incident, Mother does not identify any evidence to contradict the endangering nature of her criminal conduct or the unstable environment her conduct created. In fact, Mother's endangerment analysis makes no mention of her criminal pattern of behavior at all. And there can be no question that Mother knew she was subject to the relevant laws and community supervision conditions, and that she knew she risked incarceration by violating them.

Whether we view the evidence in the light most favorable to the judgment or weigh all of the disputed evidence, *see A.C.*, 560 S.W.3d at 630–31, the record shows that Mother's criminal behavior subjected the Children to ongoing instability that jeopardized their well-being.

### c. Conclusion

As the factfinder, the trial court could have reasonably concluded that Mother's failure to supervise her Children during the hotel incident exposed them to a dangerous environment that jeopardized their physical well-being. This evidence,

28

considered alone or coupled with the unstable home environment created by Mother's repeated criminal acts, was legally and factually sufficient to support the trial court's finding under Subsection (D). Tex. Fam. Code Ann. § 161.001(b)(1)(D); *see A.C.*, 560 S.W.3d at 630–31; *see also In re D.J.H.*, 381 S.W.3d 606, 613–14 (Tex. App.—San Antonio 2012, no pet.) (affirming factual sufficiency of Subsection (D) finding based on single dangerous incident combined with the father's "pattern of criminal activity [which] subjected him to the possibility of incarceration").

And the same evidence also demonstrated a course of endangering conduct. Mother's failure to supervise her Children, her pattern of criminal behavior, and her corresponding instability were legally and factually sufficient to allow a reasonable factfinder to conclude that her course of conduct jeopardized the Children's physical and emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E); *see A.C.*, 560 S.W.3d at 630–31.

We affirm the trial court's two endangerment predicate findings.

### B. Subsection (L): Offense Causing Serious Injury

Mother also challenges the sufficiency of the evidence to sustain the trial court's finding that she violated a third statutory predicate ground for termination: Subsection (L). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(L) (listing as a predicate ground "that the parent has . . . been convicted [of] or has been placed on community supervision . . . for being criminally responsible for the death or serious injury of a child" under one of sixteen statutorily listed Penal Code provisions). Because we have

29

already sustained the two endangerment predicate grounds, we need not address Mother's challenge to the third predicate ground. *See* Tex. R. App. P. 47.1; *In re A.S.*, No. 02-19-00429-CV, 2020 WL 2071944, at *6 (Tex. App.—Fort Worth Apr. 30, 2020, pet. denied) (mem. op.). However, the Department concedes that one aspect of the trial court's Subsection (L) finding is erroneous.

The trial court found that Mother had been convicted of or placed on community supervision for not only sexual assault, but also an offense "under the following [S]ectio[n] of the Penal Code . . . :§ 21.11 (indecency with a child)." The Department did not offer any evidence at trial to support this finding, a point that it concedes on appeal.

Although correcting this finding does not alter the final outcome of this case, we nonetheless "modify the trial court's order to match the facts" by striking the unproven indecency offense. *In re J.A.*, No. 04-20-00242-CV, 2020 WL 5027663, at *4 (Tex. App.—San Antonio Aug. 26, 2020, no pet.) (mem. op.) (modifying judgment to remove three predicate findings because "[t]he record show[ed], and the parties agree[d], that the Department pled and argued that [the mother's] parental rights should be terminated under only grounds (N), (O), and (P), not under grounds (D), (E), or (K)"); *see* Tex. R. App. P. 43.2(b).

## C. Best Interest

Mother next challenges the legal and factual sufficiency of the trial court's finding that termination was in the Children's best interest. *See* Tex. Fam. Code Ann.

§ 161.001(b)(2). The sufficiency of this finding is a much closer call than the sufficiency of the endangerment predicate findings discussed above.

### 1. Applicable Law

The best interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631; *see A.S.*, 2020 WL 2071944, at *7. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *see A.S.*, 2020 WL 2071944, at *7 (recognizing that "we generally presume that keeping children with a parent is in the children's best interest"). But this presumption may be overcome by clear and convincing evidence to the contrary. *Cf. In re C.H.*, 89 S.W.3d 17, 23–26 (Tex. 2002) (emphasizing that "[w]hile parental rights are of constitutional magnitude, they are not absolute" and discussing appellate review based on clear and convincing trial court standard).

In our review of the evidence supporting a best interest finding, we consider several factors, including (1) the desires of the child; (2) the emotional and physical needs of the child; (3) the emotional and physical danger to the child; (4) the parental abilities of those seeking custody; (5) the programs available to assist those seeking custody; (6) the plans for the child by those seeking custody and the stability of the home or proposed placement; and (7) any excuse for the acts or omissions of the parent. *A.C.*, 560 S.W.3d at 631 (listing as seven factors); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing as nine factors); *see also* Tex. Fam. Code Ann.

31

§ 263.307(b) (listing additional factors). These factors are neither exhaustive nor exclusive; not all factors are applicable in all cases, and evidence of just one factor may be sufficient to prove that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27; *A.S.*, 2020 WL 2071944, at *7; *M.R.J.M.*, 280 S.W.3d at 507. Evidence that supports the statutory predicate findings may also be probative of the child's best interest, whether or not such evidence fits neatly in one of the listed factors. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *A.S.*, 2020 WL 2071944, at *7.

## 2. Analysis

The record reveals considerable evidence both that termination was in the Children's best interest and that it was not.

As discussed above, Mother actively engaged with the Department throughout this case, and by the time of trial, she had completed (or was in the course of completing) her service plan. *See Holley*, 544 S.W.2d at 372 (listing as a best interest factor the programs available to assist the parent); *In re M.R.*, No. 02-19-00212-CV, 2019 WL 6606167, at *9 (Tex. App.—Fort Worth Dec. 5, 2019, no pet.) (mem. op.) (recognizing that "a[] parent's [compliance or] noncompliance with a service plan may be considered as evidence in . . . [determining] the child's best interest"); *cf. In re B.H.*, No. 02-21-00233-CV, 2022 WL 60739, at *7 (Tex. App.—Fort Worth Jan. 6, 2022, pet. denied) (citing *M.R.* and discussing the mother's failure to complete the service plan as part of best interest analysis). She regularly visited her Children while the

32

termination suit was pending, and she had obtained stable housing and two jobs to be able to provide for them. *See Holley*, 544 S.W.2d at 372 (listing as best interest factors the child's physical needs and the stability of the parent's home); *cf. B.H.*, 2022 WL 60739, at *7 (discussing the instability of mother's home as factor in best interest analysis); *M.R.*, 2019 WL 6606167, at *8 (noting mother's failure to maintain stable employment as consideration in best interest analysis, as well as testimony that mother's "home was 'a mess'").

Mother's caseworker testified that all of the Children she had asked expressed a desire to return home to be with Mother.[24] *Holley*, 544 S.W.2d at 372 (listing as best interest factor the child's desires). Despite testifying in favor of termination, the caseworker confirmed that "there [wa]s no question that [Mother] loves her children [and that] her children love her."

As for Mother's plans for the Children, she planned to keep all of the Children together, including Aaron upon his release from juvenile detention. *Id.* (listing as best interest factor the parent's plans for the child). Generally, it is in a child's best interest to keep siblings together whenever possible. *See, e.g., In re A.J.T.*, No. 02-12-00029-CV, 2012 WL 3499418, at *4–5 (Tex. App.—Fort Worth Aug. 16, 2012, no pet.) (per curiam) (mem. op.) (affirming best interest finding and noting that siblings were

---

[24]One of the Children expressed conflicting desires to return home with Mother but also to "stay where she's at" because she was doing well at her then-current school.

placed together); *In re B.H.R.*, 535 S.W.3d 114, 125 (Tex. App.—Texarkana 2017, no pet.) (affirming termination and noting in best interest analysis that "an adoption would keep the siblings together"); *see also* 40 Tex. Admin. Code § 700.1309(3) (2022) (Tex. Dep't of Fam. & Protective Servs., What factors does DFPS consider when selecting the most appropriate living arrangement for a child?) (listing factors the Department considers when selecting a child's substitute-care placement including that "[s]iblings removed from their home should be placed together unless such placement would be contrary to [a sibling's] safety or well-being"); *cf. In re M.H.*, 319 S.W.3d 137, 154 (Tex. App.—Waco 2010, no pet.) (clarifying, in conservatorship best interest analysis, that the preference that siblings be kept together does not apply to half-siblings, but nonetheless recognizing that the child's "emotional well-being w[ould] be adversely affected by her separation from her half-sisters").

In contrast, the Department proposed splitting the Children up among three of Mother's relatives, and it had no post-detention placement options for Aaron at all. *See Holley*, 544 S.W.2d at 372 (listing as best interest factors the agency's plans for the child and the child's future physical and emotional needs); *cf. Horvatich v. Tex. Dep't of Protective & Regul. Servs.*, 78 S.W.3d 594, 602, 604 (Tex. App.—Austin 2002, no pet.) (reversing termination on best interest issue and noting that the Department's failure to offer evidence of proposed placements for the three children made it "as likely as not that the children w[ould] remain in long-term foster care or even be separated," weighing "strongly against a finding that termination [wa]s in the children's best

interest"). The Department's three proposed placements had drawbacks as well; two of the three had not completed home studies, and none of the three had been licensed to adopt. *See In re B.K.D.*, 131 S.W.3d 10, 19 (Tex. App.—Fort Worth 2003, pet. denied) (noting in sufficiency analysis of best interest finding that the Department "did not have an adoptive home ready for [the children] at the time of trial"). These considerations weigh against the trial court's best interest finding.

Nonetheless, other evidence in the record supported the trial court's conclusion that termination was in the best interest of the Children. First and foremost, the evidence showed that Mother physically endangered the Children by failing to adequately supervise them or protect them from a loaded weapon. *See Holley*, 544 S.W.2d at 372 (listing as best interest factors the child's physical needs, the child's physical danger, and the parent's parental abilities). Although we have already detailed the evidence of such endangerment in our discussion of the Subsection (D) and (E) predicate grounds, the Children's safety is also a key focus of the best interest analysis. *See A.C.*, 560 S.W.3d at 631 (listing the child's well-being, safety, and development as the focus of the best interest analysis); *E.C.R.*, 402 S.W.3d at 249 (noting that the same evidence can be probative of both predicate grounds and best interest). The "placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a); *see also* 40 Tex. Admin. Code § 700.1309(1) (2022) (Tex. Dep't of Fam. & Protective Servs., What factors does DFPS consider when selecting the most appropriate living arrangement for a child?)

(listing factors the Department considers when selecting a child's substitute-care placement and stating that, "[f]irst and foremost, a child's placement must be safe"). And Mother's actions and preoccupation with her phone created an unsafe environment that allowed her one-year-old to shoot himself in her presence.

The Department presented evidence of other handgun-related incidents that could have reasonably contributed to a factfinder's safety concerns as well. Mother's gun incident with Father Three was another example of Mother improperly handling or securing weapons. And Mother's posing for a gun-related selfie with Aaron raised further concerns in this regard. Whether or not the handgun in the selfie was fake, the photo demonstrated indifference and poor judgment regarding handgun safety and handguns in general in light of the timing in which the photo was taken—at a time when Mother was on community supervision, while the termination case was pending, after the shooting incident with Father Three, and after her infant son had shot himself at the hotel. A parent's poor judgment may be considered in the best interest analysis, particularly when it bears upon the Children's safety. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.); *see also Holley*, 544 S.W.2d at 372 (listing as best interest factor the parent's parental abilities).

Moreover, separate and apart from these handgun incidents, Mother's repeated instances of criminal conduct rendered her home environment unstable. *See Holley*, 544 S.W.2d at 372 (listing as best interest factor the stability of the parent's home). Mother violated the Penal Code, she violated her community supervision, and she

36

violated the conditions of her bond. As we held above, these actions demonstrated a pattern of lawbreaking that created instability and a looming threat of incarceration. Just as stability is relevant to the endangerment analysis, "[t]he stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest."[25] *In re A.J.C.*, No. 14-16-00253-CV, 2016 WL 4705712, at *8 (Tex. App.—Houston [14th Dist.] Sept. 8, 2016, pet. denied) (mem. op.).

And even if the threat of incarceration never became a reality, Mother planned to work fourteen hours a day, leaving her with little time to supervise the Children or tend to their emotional or physical needs. *See Holley*, 544 S.W.2d at 372 (listing as best interest factors the child's physical and emotional needs and the child's physical and emotional danger). She confirmed that, if she maintained both jobs, she anticipated working "from 3:00 p.m. to 5:00 a.m. every day." And even if she quit one of her jobs, the job she intended to maintain required nightshifts, and it was unclear who (if anyone) would stay with the Children overnight.[26] Given that Mother's inadequate

---

[25]Mother's caseworker also testified that Mother had a history of being evicted due to her inability to control the Children's behavior.

[26]Mother's family support had other limitations as well. Although Grandmother testified that she was willing to help with the children and even to serve as managing conservator if necessary, Grandmother suffered from physical ailments that required the help of a companion. A Department representative testified that, at one point during the case, Grandmother indicated that she wanted to help with the Children but "she was sick and could not really take care of herself." And Mother's brother, who lived with Grandmother, indicated his belief that Grandmother would

37

supervision created an unsafe environment that led to the Children's removal in the first place, a reasonable factfinder could have seen Mother's anticipated 14-hour-a-day absences as a continuation of the same unacceptable environment.

### 3. Conclusion

There are factors on both sides of the best interest issue. Mother clearly loves her Children. And there is no doubt that she showed improvement. She completed all of the services the Department asked of her, she secured stable housing and employment, and she worked to get her Children back. But "evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices." *J.F.-G.*, 627 S.W.3d at 316–17 (quoting *J.O.A.*, 283 S.W.3d at 346). The evidence showed that Mother failed to adequately supervise the Children, she repeatedly violated the law, she jeopardized her ability to care for the Children, she exposed them to an unstable home environment, and she demonstrated a pattern of improper gun safety and questionable gun-related judgment.

The best interest evidence was not "so significant" or lopsided so as to prevent the trial court from forming a firm belief or conviction that termination was in the

---

not be able to care for the Children. The Department also discovered that Grandmother and Grandmother's companion both had a history of drug use, although the drug use was in the relatively distant past. And Mother's adult daughter had limitations of a different sort. The daughter was just 19 years old at the time of trial, she already had a baby of her own, and she had been living with Mother until recently.

38

Children's best interest. *A.C.*, 560 S.W.3d at 631; *see* Tex. Fam. Code Ann. § 161.001(b)(2). The trial court's decision was not an easy one, but it was a legally and factually sufficient one. Therefore, we overrule Mother's best interest challenge.

### III. Conclusion

The record contains legally and factually sufficient evidence to allow a reasonable factfinder to form a firm belief or conviction that Mother had endangered the Children by their conditions or surroundings, that she had endangered the Children by her conduct, and that termination was in the best interest of the Children. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (b)(1)(E), (b)(2). We modify the trial court's judgment to remove the erroneous reference to indecency with a child, and we affirm the trial court's judgment as modified. Tex. R. App. P. 43.2(b).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: April 28, 2022